IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 21-79 |
| COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC, d/b/a Brighton Rehabilitation and Wellness Center; | |
| MT. LEBANON OPERATIONS, LLC, d/b/a Mount Lebanon Rehabilitation and Wellness Center, | |
| Defendants. | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS BRIGHTON'S AND MT. LEBANON'S MOTION FOR A NEW TRIAL UNDER RULE 33**

The United States of America, by its attorneys, Eric G. Olshan, United States Attorney for the Western District of Pennsylvania, and Stephen R. Kaufman, Nicole A. Stockey, Karen Gal-Or, and Jacqueline C. Brown, Assistant United States Attorneys for said District, and Aaron McKendry, Special Assistant United States Attorney, hereby respond in opposition to Brighton Rehabilitation and Wellness Center ("Brighton") and Mt. Lebanon Rehabilitation and Wellness Center's ("Mt. Lebanon") (together, "the Facilities" or "the corporate Defendants") Motion for a New Trial Under Rule 33 at ECF 420 (hereinafter "Defendants' Motion").

Defendants' Motion should be denied as the jury's verdict was not against the manifest weight of the evidence. After deliberating for many hours following a five-week trial, the jury correctly returned guilty verdicts against the corporate Defendants (Brighton and Mt. Lebanon) on Counts 2 through 7, and 9 through 12 of the Superseding Indictment. There was, undoubtedly, no miscarriage of justice. The evidence presented at trial established that the agents/employees of

1

both corporate Defendants, acting on behalf of these entities, and with the intent to benefit these entities, broke federal laws.  No movie quote is going to change that fact.[1]

As discussed in the government's response in opposition to the corporate Defendants' Rule 29 Motion ("Rule 29 Response") (ECF 418 at pp. 5-6), a corporate defendant's guilt can be predicated on the acts or specific intent of an agent and/or employee who was acquitted by a jury on the same charge.  Accordingly, even if the individual defendants in this case were acquitted by the jury, the corporate Defendants may (and should) still be found guilty on each charged count against them. *United States v. LBS Bank-New York, Inc.*, 757 F. Supp. 496, 501 (E.D. Pa. 1990); *United States v. Vastine*, 363 F.2d 853, 854 (3d Cir.1966).  In this case, various agents/employees of Brighton and Mt. Lebanon, both indicted and unindicted, acting within the scope of their authority and with the intent to benefit the corporate Defendants, violated federal law. *United States v. Vastardis*, 448 F. Supp. 3d 391, 395 (D. Del. 2020). The verdicts against the corporate Defendants should stand and the Court should deny Defendants' Motion.

Though argued under a different Federal Rule of Criminal Procedure, Rule 33, Defendants' Motion mainly rehashes their previous arguments in their recent Rule 29 Motion (ECFs 377 and 419).  Again, like before, Defendants' Motion is premised upon cherry-picked trial testimony, incomplete recitations of trial evidence, and misconstrued interpretations of the offenses' elements. Furthermore, the government presented more than enough credible evidence at trial to support the corporate Defendants' convictions.  Accordingly, Defendants' Motion should be denied.

## **LEGAL STANDARD**

---

[1] "I only lied about being a thief, I don't do that anymore." *Ocean's Eleven* quote cited in Defendants' Motion at p. 1.

A.      **Under Third Circuit law, this is not an "exceptional circumstance" warranting a new trial.**

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, a court may grant a new trial "if the interest of justice so requires." Fed.R.Crim.P. 33(a). Notably, when a district court evaluates a Rule 33 motion "it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008).  That said, even if a district court believes that the jury verdict is contrary to the weight of the evidence, the court can order a new trial ***only if it believes that there is a serious danger that a miscarriage of justice has occurred***—that is, that an innocent person has been convicted." *Id.* at 1004-05 (internal quotation marks omitted) (emphasis added). That is not the case here. As discussed further below, the government presented credible and sufficient evidence to support the corporate Defendants' convictions.

Motions for a new trial "are not favored and should be granted sparingly and only in exceptional cases." *Id.* at 1005 (internal quotation marks omitted).  The corporate Defendants acknowledge that a Rule 33 motion should be granted only in "exceptional circumstances" and are "not favored."  Defendants' Motion at p. 3 (citing *United States v. Brennan*, 326 F.3d 176, 188-89 (3d Cir. 2003); *see also United States v. Archer*, 977 F.3d 181, 187–88 (2d Cir. 2020) (courts may grant a new trial if the evidence does not support the verdict, but such action must be done "sparingly" and in "the most extraordinary circumstances"); *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (holding that a court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be "manifest injustice" to let the verdict stand).

Even when multiple trial errors are alleged, a new trial may be granted only where the errors, "when combined, so infected the jury's deliberations that they had a substantial influence

3

on the outcome of the trial." *United States v. Kolodesh*, 2014 WL 1876214, at *3 (E.D. Pa. May 12, 2014) (citing *United States v. Copple*, 24 F.3d 535, 547 n. 17 (3d Cir.1994)). As to the instant case, the government is not aware of any errors at trial. Further, even if any such errors occurred, the corporate Defendants have not identified any such errors that would have had a substantial impact on the outcome at trial.

When addressing a Rule 33 motion, a district court may not "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997); *see also Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1160 (8th Cir. 1999) (holding that a district court may not grant a new trial "simply because it believes other inferences and conclusions are more reasonable"). Rather, absent a situation where the evidence was "patently incredible or defies physical realities," or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must "defer to the jury's resolution of conflicting evidence." *United States v. McCourty*, 562 F.3d 458, 475–76 (2d Cir. 2009). Further a district court faced with a Rule 33 motion, like with a Rule 29 motion, must be careful to consider any reliable trial evidence as a whole and not just on a piecemeal basis. *See United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000).

Here, there was no miscarriage of justice. Given the government's evidence at trial, the corporate Defendants were not innocent, yet somehow convicted. The trial evidence was not "patently incredible" nor did the evidence defy physical realities. *McCourty*, 562 F.3d at 475–76. Rather, the trial evidence presented against both Brighton and Mt. Lebanon supported their guilty

verdicts.  The jury was entitled to weigh and resolve any conflicts in evidence, which they did here.  Indeed, this is far from an "exceptional case" and the Defendants' Motion should be denied.

## **ARGUMENT**

A.     **The government presented extremely credible evidence as to all key elements of the charged offenses.**

The corporate Defendants' arguments in this motion are very similar to their arguments in their Rule 29 Motion. (ECF 377).  Under both applicable legal standards, however, their convictions should stand.  After a five-week trial, where the government presented hundreds of exhibits and twenty-nine (29) witnesses, the jury, after deliberating for over 10 hours, found the corporate Defendants guilty based upon credible and corroborated evidence.

Further, the jury rendered guilty verdicts against the corporate Defendants after instructed on corporate culpability and the elements of the charged offenses.  The jury was instructed at both the beginning and end of the trial.  In the end, the jury found Brighton guilty as to Counts Two, Three, Four, Five, Six, and Seven, and separately, Mt.  Lebanon guilty of Counts Nine, Ten, Eleven, and Twelve, as charged in the Superseding Indictment.[2] The Court should defer to the jury's resolution of the evidence and these verdicts should not be disturbed.

---

[2] Further discussion regarding corporate culpability for Brighton and Mt. Lebanon is discussed in the Government's Response in Opposition to corporate Defendants' Rule 29 Motion at ECF 418 at pp. 3-6.

1.     **Brighton and Mt. Lebanon willfully defrauded federal healthcare benefit programs in violation of 18 U.S.C. 1035 (Counts Two and Nine)**

The jury's verdict on Counts Two and Nine were not against the manifest weight of the evidence. Rather the guilty verdicts against the corporate Defendants were well-supported by credible evidence establishing each element of 18 U.S.C. 1035.

As explained in detail below, despite the corporate Defendants' attempts to cherry-pick testimony and paraphrase evidence to favor their position, the evidence presented at trial clearly establishes that Defendants violated 18 U.S.C. § 1035 ("Section 1035"). Namely, the government proved beyond a reasonable doubt that the corporate Defendants: falsified, concealed, or covered up by trick, scheme, or device a fact in a matter involving a health care benefit program. *United States v. Advantage Med. Transp., Inc.*, 751 F. App'x 258, 261 (3d Cir. 2018). Second, that the falsifications were material. *Id.* The corporate Defendants did so knowingly and willfully. *Id.* And finally, that the corporate Defendants did so in connection with the delivery of or payment for health care benefits, items, or services. *See also* Fed. Crim. Jury Instr. 7th Cir. 1035[1] (2023 ed.). The government proved these Section 1035 elements as to both corporate Defendants (Brighton and Mt. Lebanon) as further summarized below and discussed herein.

As to Brighton, the government's evidence at trial established that Brighton was routinely under the requisite per patient day ("PPD") number (*i.e.,* staffing requirement), and that agents/employees of Brighton knowingly and willfully falsified staffing sheets provided to the Pennsylvania Department of Health ("DOH") to inflate the staffing numbers/ratio. These falsifications were submitted to the DOH while this agency was acting on behalf of both the state and federal governments. In addition to the documentary evidence at trial (*i.e.,* staffing sheets/surveys with falsifications) Brighton's scheduler/administrative assistant, Susan Harrington, testified that when she calculated PPD, there were many times when Brighton was

projected to be under the requisite 2.7 PPD.  December 1, 2023 Trial Transcript, Harrington at 13.

Further, Harrington testified that there were times when Brighton operated under 2.7 PPD.  *Id.* at

14 (stating that being under 2.7 PPD "happened a lot").

Further, according to Harrington, Brighton's Director of Nursing ("DON"), Eva Hamilton,

also believed the facility was operating under the requisite staffing requirements, including being

below 2.7 PPD.  *Id.* at 15.  According to Harrington, if the facility [Brighton] was not going to

make PPD, the DON [Hamilton] directed Harrington to "put people's names that weren't there"

on the staffing sheets.  *Id.* at 24. Harrington explained that: "For example, if an agency person that

worked in our building, say, two days a week, okay, Monday, Tuesday, and we were short on

Wednesday, she [Hamilton] asked me to put that person's name in for Wednesday so we could

count them as staff."  *Id.* at 24.  Harrington testified that, as the years went on, "it happened more

[adding names] and more often." *Id.* at 27.  Harrington further testified that "as the PPD numbers

got worse and we needed more people, we would add more names."  *Id* at 27.

In addition to explaining the frequency and process of making these falsifications,

Harrington also testified regarding other agent/employees' knowledge and facilitation of the

falsification scheme.  She explained that a couple years before she was terminated in January 2020

(in or around 2018) and at a time she believed was shortly after a survey, she told Brighton's part

owner and CEO, Sam Halper, that "we're putting names down of people that aren't in the

building." To which Halper responded to Harrington, "Just keep doing what you're doing and I

didn't hear you say that."  *Id.* at 31, 174.  In turning a blind eye and further encouraging, if not

instructing, Harrington to continue this falsification scheme, Halper implicitly agreed to participate

in this criminal conduct.  Further, Halper, an experienced skilled nursing administrator and owner

of multiple facilities, was well-aware of the staffing shortages at Brighton and the state and federal

staffing requirements. *Id.* at 185-186. Halper certainly did not stop and/or put an end to the falsifications or raise any concerns about the practice. *Id.* at 31.

Harrington also testified that Brighton's DON, Eva Hamilton, instructed her to put administrative staff and unit directors on the staffing sheets, even if those supervisors were not providing direct patient care as required by the regulations. *Id.* at 24. Harrington testified that she heeded Hamilton's directives, and added names of individuals to the staffing sheets who were not actually working. *Id.* at 25. Further, Harrington testified that both Hamilton and Halper "encouraged me to continue falsifying staffing sheets." *Id.* at 31.

Brighton's culpability under Section 1035 was further supported by the testimony of Brighton's current Assistant Director of Nursing ("ADON"), Jane Quinn, who corroborated Harrington's testimony regarding the staffing falsifications at Brighton. Like Harrington, Quinn testified that Hamilton asked her to falsify staffing sheets submitted to the DOH in early 2020, right after Susan Harrington was terminated. *November 28, 2023 Transcript*, *Quinn*, at 45-46. Thus, the trial evidence established that Harrington was following directives from others (*i.e.,* Hamilton and Halper) and was not falsifying staffing sheets on her own volition. Like she did with Harrington, Hamilton directed Quinn to make falsifications in Brighton's staffing sheets for the DOH. Moreover, these falsifications were being made within the agents'/employees' scope of authority and to benefit Brighton.

Quinn testified on direct examination as follows: "From what I recall, we were not making – not able to make PPD on a certain date during the survey, and she [Hamilton] asked me to go and add some names to the staffing, like the sheets that you just showed me, that type of sheet, and then calculate that in." *Id.* at 46. When Quinn was then asked on direct examination if she knew

if those individuals were working in the building at that time, Quinn responded: "They would have just been random names, so no. Working people would have already been on there." *Id.* at 45-46.

As to Mt. Lebanon, various witnesses at trial testified that the staffing sheets provided to DOH were falsified (like as was the case at Brighton).  Though the falsification scheme was slightly different at Mt. Lebanon, it had the same effect – providing material falsifications to DOH (acting on behalf of the Centers for Medicare and Medicaid, CMS) that concealed facts in a matter involving a healthcare befit program.  *United States v. Advantage Med. Transp., Inc*., 751 F. App'x 258, 261 (3d Cir. 2018); Fed. Crim. Jury Instr. 7th Cir. 1035[1] (2023 ed.).

Specifically, at Mt. Lebanon, the government presented evidence that various Mt. Lebanon employees/agents, including Susan Gilbert (former Administrator), Yochanan Naiditch (former Assistant Director of Nursing/ADON), Margaret Zapor (former Regional Director), and Martha Stillwagon (former Director of Human Resources), falsified staffing sheets submitted to DOH. Additionally, Tracie Benson, a current Licensed Practical Nurse Assessment Coordinator, testified that she confronted Margaret Zapor, a regional director of operations, and Susan Gilbert, the administrator, with her concern that her hours were being counted towards the Facility's PPD calculations when Benson was not providing direct patient care.  *November 29, 2023 Trial Transcript, Benson* at 36.  Zapor and Gilbert responded that Benson "work[s] for the company, and they will use the hours where they see fit."  *Id.* at 37.  Benson's testimony corroborated that the falsification scheme at Mt. Lebanon and its purpose – to ensure Mt. Lebanon met the requisite staffing requirements – and was not just a side hustle for Naiditch as Mt. Lebanon claims.

The government also presented evidence that Stillwagon and Naiditch engaged in falsifying staffing sheets submitted to the DOH.  *November 30, 2023 Trial Transcript, Naiditch* at 10.  According to Naiditch, he was told to clock into work "just to utilize the hours." *Id.* at 10-11.

Stillwagon also directed Naiditch to clock in to indicate that he was working, even when he was not actually working, to artificially inflate PPD. *Id.* at 16. And while Naiditch received bonuses for doing so, this practice was used to ensure that Mt. Lebanon met the staffing requirements for future DOH surveys. *Id.* at 52. *See also November 29, 2023 Trial Transcript, Benson* at 35-36, 48, 50. Thus, these agents/employees were acting within the scope of their authority and to benefit Mt. Lebanon.

Gilbert, Mt. Lebanon's former administrator, was also aware of and facilitated this "punching in and leaving" practice to meet staffing requirements at Mt. Lebanon when the requisite hours were predicted to be low. According to Naiditch, he had "different conversations [with Gilbert] just throughout the time… [and that] here are our hours for the weekend…we can use…my hours on Saturday… [and] it would get us up to the hours that we need for the 2.7 number." *November 30, 2023 Trial Transcript, Naiditch* at 12. Though the corporate Defendants claim that Naiditch is a "liar" and "thief," the trial evidence corroborates Naiditch's testimony that this "punch in and leave" practice was used to benefit Mt. Lebanon and that this practice was known to (and employed by) others acting on behalf of Mt. Lebanon.

Naiditch's testimony was further corroborated by the documentary evidence (*i.e.,* Government Exhibit 987, a DOH survey showing Naiditch working on November 29, 2019, during the 3:00 p.m. to 11:00 p.m. shift). Naiditch knew that he did not actually work on the day reported in this survey (November 29, 2019) because it was a Friday. At the time, Naiditch practiced Orthodox Judaism. *Id.* at 17. Thus, he did not work on the Sabbath after sundown. *Id.* Naiditch also pointed out four other shifts where his name was included on the staffing sheets submitted to the DOH even when he was not working due to his religious observances. *Id.* at 27-29.

Trial evidence also established that other employees/agents were asked to punch-in and leave and/or to have their punches/hours used (*i.e.*, Vivian Miller and Tracie Benson). *November 29, 2023 Trial Transcript, Miller* at 7-9; *November 29, 2023 Trial Transcript, Benson* at 37. This evidence shows that this practice was not isolated to one alleged thief or liar but was more extensive and employed to benefit Mt. Lebanon. Overall, the evidence presented at trial, established that Susan Gilbert, Yochanan Naiditch, and Martha Stillwagon, as well as other employees/agents of Mt. Lebanon, falsified and misrepresented facts in a matter involving a health care benefit program by falsifying staffing sheets submitted to DOH acting on behalf of CMS.

In addition to hearing witness testimony at trial, the jury also saw direct documentary evidence of these materially false statements. This evidence included falsified staffing sheets that the agents/employees of the corporate Defendants provided to the DOH – again, while the DOH was also acting on behalf of a federal agency, the Centers for Medicare and Medicaid Services ("CMS").  *See e.g.,* Government Exhibits 929a, 929b, 929c, 935a, 938a, 950a, 957a, 959a, 986a, 990a, 992a, 993a.

The jury also learned about dozens of falsifications in the staffing sheets – both at Brighton and Mt. Lebanon – during the direct examination of FBI Special Agent Amber Leszczynski. Special Agent Leszczynski walked the jury through example after example of falsification involving individuals who were not working, or not even in building, but were still listed on the staffing sheets at both Brighton and Mt. Lebanon.  *December 7, 2023 Trial Transcript, Leszczynski* at 95-111, 113-147.  Special Agent Leszczynski also testified about other falsifications involving staff not providing direct patient care as required, but still being reported as doing so on the staffing

sheets provided to DOH. *Id.* S*ee also,* Government Exhibits 4650A, 4386A, 4719, 4652A, 4720, 4388A, 4401A, 4401B.

> **2.     The staffing falsifications were "material" despite the corporate Defendants attempts to misconstrue this term and the evidence.**

In attacking their guilty verdicts, the corporate Defendants attempt to create confusion as to the elements of Section 1035. First the corporate Defendants attempt to rely on the wrong "materiality" analysis. Though materiality is addressed in the Rule 29 Response (ECF 418), the appropriate materiality standard is worth addressing again here. This is especially true given the corporate Defendants' continued misinterpretation of this requirement.

It is well settled that a fact is "material" if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Advantage Med. Transport, Inc*., 751 F. App'x 258, 261 (3d Cir. 2018) (citing *United States v. McLaughlin*, 386 F.3d 547, 553 (3d Cir. 2004)). A statement may be material even if an agency did not actually rely on the statement in making a decision. *Id.* (citing *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995)). The inquiry, then, "is whether the test for 'materiality' necessarily requires that a false statement be capable of influencing an *actual*, *particular* decision of the agency at issue, or whether the test requires only that a statement be of a type that would naturally tend to influence a *reasonable* decision-making agency in the abstract." *United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005) (emphasis in original). The Third Circuit held that the latter formulation was the proper test for "materiality." *Id.* at 351.

Rather than relying on Third Circuit and other precedential case law, the corporate Defendants attempt to pivot and rely on a different interpretation and analysis, i.e., "reasonable likelihood" or "close to a probability." Defendants' Motion at pp. 5-6. This interpretation is not only inaccurate, but flies in the face of the Court's decision (i.e., ECF 317 at p. 6). As this Court

clearly stated in its Opinion (ECF 317 at pp. 6): "the allegedly falsified forms are material if the misreported information in the PPD forms **had a natural tendency to influence, or was capable of influencing, the decision** of the Department of Health to not interfere with Defendants' continued admission of Medicare and Medicaid residents and receipt of Medicare and Medicaid payments." The Court continued that to "prove materiality in this case, the Government is not required to introduce evidence of the quality of patient care that might have been involved with alleged understaffing, but rather must produce evidence that establishes that the allegedly false statements in the PPD forms respecting staffing at the facilities were the type that had the tendency to influence DOH action." *Id.* at pp. 6-7. This is exactly what the government established at trial.

In addressing the correct materiality standard, courts have long held that a falsified document need not actually be relied upon, or even submitted, to a decisionmaker to be material. *See e.g., United States v. Hartline*, 746 F. App'x 124, 128 (3d Cir. 2018) ("Actual influence need not be proven as long as the evidence is sufficient to support a conclusion that the misrepresentations could have influenced the decision maker."). By way of example, in *United States v. Salko*, 2008 WL 4671769 (M.D. Pa. Oct. 20, 2008), the defendant argued that falsified progress notes could not be material for the purposes of Section 1035 because they were not submitted to Medicare. The court rejected this argument, explaining:

> [Section 1035] on its face does not require that the alleged falsehoods be submitted to Medicare or otherwise relied upon by the agency in order to be punishable. The text of the statute makes it a crime to make materially false statements or representations in connection with the delivery of or payment for health care benefits or services. It also criminalizes the making or use of a materially false writing or document known to contain a materially false statement or entry in connection with the delivery of or payment for health care benefits or services. The text does not require that the falsehood be relied upon or even specifically addressed to the health care benefit program.

Id. at *2.

Similarly, in *Advantage Medical Transport,* the court explain that a falsification need not directly influence a payment decision to be material. *Advantage Med. Transp., Inc.*, 751 F. App'x at 261–62.  In that same vein, the *Natale* court held that falsifications in operative reports were material because Medicare *sometimes requests* these reports during audits. *Id.* at 738 (emphasis added). *United States v. Natale*, 719 F.3d 719, 735 (7th Cir. 2013).[3] The *Natale* court determined that materiality requires "only a potentiality of influencing the decisionmaker; it does not require actual reliance." *Id.* at 738 (citing *United States v. Gulley*, 992 F.2d 108, 112–13 (7th Cir.1993). In this case, the falsifications were material because they had the tendency and/or were capable of influencing the agencies' decisions as the trial evidence stablished.

Applying this correct materiality standard, there was credible and corroborated testimony establishing this element from the DOH and CMS representatives.  The DOH, acting on behalf of CMS, requests and reviews documentation regarding the facility's staffing (*i.e.,* the falsified staffing sheets) and relies on that documentation to assess whether the facility complied with state and federal regulations.  *November 20, 2023 Transcript, Williamson* at 49-50.  Specifically, Susan Williamson, the Director of the Division of Nursing Care Facilities for the DOH, extensively testified that DOH is acting on the behalf of CMS during DOH surveys to skilled nursing facilities,

---

[3] The district court in *United States v. Sivchuk*, 2012 WL 2328143 (E.D. Pa. June 13, 2012) further explained that, while the falsehood must be "capable of influencing, the decision of the decision-making body to which it was addressed," it need not in fact be material to the delivery of or payment for health care benefits.  The court explained:

> The term 'materially' immediately precedes and modifies 'false, fictitious, or fraudulent,' not 'delivery of or payment for health care benefits, items, or services.' Under the statute [§ 1035], the statement must be 'materially false' and 'in connection with the delivery of or payment for health care benefits'—the statement need not be material to the delivery of or payment for health-care benefits.

*Id*. at *8.

including Brighton and Mt. Lebanon. *Id.* at 112. As corporate Defendants note, and as Williamson explained, the DOH was wearing two hats during its various surveys at Brighton and Mt. Lebanon, its "state hat" and its "federal hat." Defendants' Motion at p. 6; *see also Id.* at 47.

Moreover, Williamson testified that the DOH uses staffing sheets to assist in determining a facility's compliance with ***state and federal regulations***. *Id.* at 113, 117. She also testified that staffing levels matter to DOH because "staffing is really the backbone of taking care of residents…[w]ithout staffing, and without being honest about the staffing, [] residents are not going to get the care they require." *Id.* at 116. According to Williamson, false statements in documentation provided to DOH relating to staffing would **"hugely impact"** surveyors' ability to do their work. *Id.* at 117. In fact, according to Williamson, "[i]t would make it impossible for [surveyors] to do [their] work" because surveyors "wouldn't be able to tell that the information was correct, and the residents were receiving the care that they needed." *Id.* (stating that it is important for the names and supporting documentation provided in three-week staffing sheets to be accurate).

Williamson also testified as to the sanctions available to the DOH and CMS if the agencies determine a facility is out of compliance with federal and state regulations. Specifically, Williamson testified that the DOH has certain sanctions in its toolbelt, including admission bans. *Id.* at pp. 17-18, 51, 74, 115. She explained that these admission bans are more likely to be imposed for repeated noncompliance, particularly those involving staffing. *Id.* at 115-116. According to Williamson, if a facility does not have "enough staff, you may not be able to take on more residents." *Id.* at 19. Further, Williamson testified that DOH **is more likely to impose sanctions if a facility is intentionally falsifying records**. *Id.* at 53.

15

Williamson's trial testimony alone establishes the requisite materiality under Section 1035. Namely, the falsifications on staffing sheets, provided directly to DOH were very capable of influencing (and would influence if known) the decisions of both DOH and CMS. *Id.* at 112. That said, Williamson's testimony reflects only a portion of the government's evidence concerning materiality. The government also presented evidence regarding Brighton's Provisional Two (2) license during the charged time period (*i.e.,* Government Exhibits 800 and 881). Further trial evidence established that after a facility receives four provisional licenses, it would lose its license and no longer be able to receive Medicare and Medicaid payments. *Id.* at 16-18. This served as further evidence that lack of compliance and falsifications regarding staffing could have resulted in serious consequences and substantial sanctions for non-compliance. Furthermore, the employees and agents of the facilities were aware of these sanctions and ramifications, providing them with incentives to lie and make false representations during the various surveys. *See e.g., December 1, 2023 Transcript, Harrington* at 25.

As far as materiality, during the government's case-in-chief, the jury also heard from Evan Shulman, the Director of the Division of Nursing Homes from CMS. Shulman testified that lies on staffing sheets were material because they impacted the surveyors' ability to determine compliance with federal regulations as required for participation in Medicare and Medicaid. *December 8, 2023 Transcript, Shulman* at 207. Shulman also testified that the "state does not have its ability to do its job on behalf of CMS... if a facility puts names of people on those staffing [sheets]…who are not actually working on the dates that they are listed as having worked." *Id.* Shulman also explained that staffing sheet falsifications were "concerning" given that the staffing regulations require facilities to have "competent staff," and "[CMS] need[s] to know exactly who was working that may have contributed towards some noncompliance related to not being trained."

*Id.* Shulman added that "many regulations that depend upon the investigators to interview the specific person that was working on a given day, a given shift, a given area, location, on a given resident in a facility…those are just a couple of examples, without having the specific names, the state agency on behalf of CMS would not be able to investigate those areas." *Id.*

According to Shulman, CMS expects the staffing information provided to the DOH on behalf of CMS to be "accurate" regardless of the specific form or tool used. *Id.* at 208. Shulman testified that the "form that the facility has given to the surveyors to help them demonstrate compliance, that information should be accurate" and that this information should be accurate for CMS to determine compliance with the conditions of participation in Medicare and Medicaid. *Id.*

All of this evidence, including testimony from the DOH and CMS representatives, establish that the falsifications to the DOH were material. Both agencies expect and require the staffing information to be accurate to make compliance determinations. Falsifications in the staffing information can (and do) influence the agencies' abilities to make determinations regarding compliance with regulations and compliance with Medicare and Medicaid participation conditions. These falsifications also impact the potential sanctions that the agencies can impose.

Given this evidence, the corporate Defendants' attempt to move the goalpost. Specifically, they attempt to shift the "materiality" standard and argue that it must be "reasonably likely" to influence the decisionmaker. Defendants' Motion at pp. 5-8. This is ***not*** the same standard as "natural tendency" or "capable of influencing" an agency's decision. The corporate Defendants' attempt to shift the materiality analysis should be rejected and this Court should continue to apply the materiality standard previously applied. ECF 317. Given the well-established materiality standard, the government's evidence at trial, including the aforementioned testimony from the

DOH and CMS witnesses, which was both credible and corroborated, the jury's guilty verdict on the Section 1035 counts should stand.

The corporate Defendants further argue that the falsifications on the staffing sheets were not related to any CMS decision. Shulman's trial testimony discussed above contradicts this argument. Further, even if that was the case, which it is not, under the proper materiality standard, a statement "may be material even if no agency actually relied on the statement in making a decision." *In re Cohn*, 54 F.3d 1108, 1114 (3d Cir. 1995)). Even if the staffing sheets were not a form that was generated and/or used by CMS, As Shulman discussed, this federal agency relied on the information and its accuracy. As Shulman testified, the staffing falsifications mattered to CMS and impacted its decisions. Further, the forms were used by the DOH to determine compliance with state **and federal regulations** and the falsifications impacted the DOH's and CMS's decision-making and compliance assessments.

### 3.     The trial evidence established that both Mt. Lebanon and Brighton, through their agents/employees, acted willfully.

The corporate Defendants also attempt to evade criminal liability under Section 1035 by claiming that the falsifications were "mistakes" and not willful falsifications. Defendants' Motion at p. 10. The trial evidence overwhelmingly established that the falsifications were not "mistakes." At trial, the evidence established that the falsifications were intentional. Specifically, various witnesses testified that they made (or were asked to make) falsifications knowingly in that they were not following the requisite policies and/or were intentionally putting names of people not actually working on staffing sheets. These witnesses (*i.e.,* Harrington, Naiditch) also testified that they engaged in this conduct to benefit their employers (*i.e.,* the corporate Defendants).

In making their argument, the corporate Defendants rely on cherry-picked statements from Susan Harrington's cross-examination. That said, Harrington admitted that she knew it [the

falsifications] was "wrong." *December 1, 2023 Trial Transcript, Harrington* at 92, 95, 111. Even given her relatively lower-level position at Brighton (essentially a scheduling "clerk"), Harrington knew that she was doing something improper when she was making the falsifications on staffing sheets. Moreover, Harrington, made these falsifications at the direction of her superiors, including Owner/Operator, Sam Halper and the DON, Eva Hamilton. *Id.* at 8, 56, 99, 105, 142. Harrington's testimony further establishes that she acted knowingly and willingly because she knew that she was doing something improper with the purpose of deceiving the DOH. *Id.* at 92, 95, 111. Harrington testified that she was "surprised" by Hamilton's request to falsify staffing sheets because "[i]t was not [her] normal way of operating." *Id.* at 25. Harrington also knew the information she put on the staffing forms was "untrue," that it "wasn't right," and that it was "wrong." *Id.* at 92, 95, 111.

Accordingly, these agents/employees were not just making mistakes or even just taking "advantage of ambiguous or technical provisions" of the rules as the corporate Defendants claim, but purposefully adding names of people not in the building to inflate staffing numbers and make it appear like the facility was meeting the state and federal staffing requirements. Defendants' Motion at p. 11. *December 1, 2023 Trial Transcript, Harrington* at 27. Even though she was not as experienced as Halper and Hamilton, Harrington knew that her conduct was, "in some general sense," unlawful. *See United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009).[4] She knew the falsifications were "wrong" even if she had never heard of Section 1035.

---

[4] It's a well-established principle that "ignorance of the law is typically no defense to criminal prosecution." *McFadden v. United States*, 576 U.S. 186, 192 (2015); *Cheek v. United States*, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."). Thus, it is not a defense to criminal liability that Harrington did not know her falsifications on staffing sheets violated a specific federal criminal statute. Specifically, 18 U.S.C. § 1035 (Counts 2 and 9) requires the defendant to have acted willfully. In the context of § 1035, the actor does not need to have

Moreover, whether Harrington knew that she was committing a specific crime is irrelevant. *See United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009) ("[W]hen 'willfully' is used in a criminal statute, and particularly where the term is used in conjunction with 'knowingly,' [] it usually requires the government to prove that the defendant acted 'not merely voluntarily, but with a 'bad purpose,' that is, with knowledge that his conduct was, *in some general sense*, 'unlawful.'") (emphasis added); Third Circuit Model Criminal Jury Instructions § 5.05 (providing that "willfully" requires the government to prove beyond a reasonable doubt that a defendant "knew that [his or her] conduct was unlawful and intended to do something that the law forbids"). Harrington knew she was acting with a bad purpose. Further, as an employee of Brighton, Harrington's conduct binds the corporation.

Further, other agents/employees of Brighton acted willfully. In addition to Harrington, Hamilton and Halper acted willfully by making and/or directing others to make (and to continue to make) falsifications. The trial evidence established that Halper was experienced, extremely hands-on, and very involved in Brighton's staffing decisions.  The evidence also established that Halper was involved in communicating with the DOH, both during and after surveys. Thus, when he directed Harrington to just "keep" falsifying the staffing sheets, he was acting willfully.

Additionally, Brighton's DON, Hamilton, who oversaw the nursing activities and staff of this 580-bed facility, was the primary point of contact when the DOH surveyors came to the

---

knowledge of the specific crime she is committing. *See Starnes*, 583 F.3d at 210 ("[W]hen 'willfully' is used in a criminal statute, and particularly where the term is used in conjunction with 'knowingly,' [] it usually requires the government to prove that the defendant acted 'not merely voluntarily, but with a 'bad purpose,' that is, with knowledge that his conduct was, in some general sense, 'unlawful.'") (emphasis added); However, in the context of § 1035, the term willingly requires the government to prove beyond a reasonable doubt that a defendant "knew that [his or her] conduct was unlawful and intended to do something that the law forbids." *See* Third Circuit Model Criminal Jury Instructions § 5.05.

facility.  *November 16, 2023 Trial Transcript, Nusser* at 29.  As Brighton's DON, Hamilton worked on staffing sheets herself and with others to complete staffing sheets provided to DOH surveyors. As at least two witnesses (*i.e.,* Harrington and Quinn) testified at trial that Hamilton directed them to put down the names of people not working at the time to inflate the staffing numbers at Brighton.  *December 1, 2023 Trial Transcript, Harrington* at 210; *November 28, 2023 Trial Transcript, Quinn* at 46.  Again, these were not "mistakes," but deliberate falsifications to avoid further scrutiny and sanctions from the DOH and CMS.

Hamilton, who directed the unlawful conduct, was also aware of the consequences for non-compliance. As the DON of the third-largest nursing home in Pennsylvania, Hamilton was well informed as to the DOH's and CMS's regulations and the survey process. The trial evidence established that Hamilton acted knowingly and willfully as she would "find" [using air quotes] documents during the DOH surveys.  *November 16, 2023 Trial Transcript, Nusser* at 29. Hamilton's deliberate use of air quotes when saying "find," is extremely significant and was placed on the trial record given its implication.  It is more than reasonable to interpret Hamilton's statement and corresponding gesture to mean that she was fabricating documents – and that she knew this was improper and unlawful.

Harrington further testified that Hamilton told her that Brighton "would be fined if we were short … [and] could also be made to stop accepting admissions." *December 1, 2023 Trial Transcript, Harrington* at 25.  According to Harrington, Hamilton also wanted to avoid a ban on admissions as it was "very important to the administration [to keep] admissions up and [get] to a 500 number." *Id.*  This "500" target was further echoed by other witnesses.  *November 21, 2023 Trial Transcript,* Ifft at 27-29.

Further, at least one former nursing employee at Brighton testified that her hours were used on staffing sheets when she knew she was on vacation (and not in the building). This was just *one* example of such falsifications during a survey. *November 29, 2023 Trial Transcript, Dobish* at 81. Dobish testified that her supervisor, Hamilton, would need to approve her vacation time and would know that Dobish would be on vacation those days.  Nonetheless, Dobish's name and hours were listed on the staffing sheets during those (vacation) days. Those staffing sheets with falsified hours (just one example of many) were then provided to the DOH. Again, these were willful and intentional falsifications, not "mistakes."

In addition to Hamilton, other higher-level Brighton personnel (*i.e.,* former Brighton administrators during the charged timeframe) acted knowingly and willingly. For example, as mentioned, Sam Halper knew that lying about staffing to these agencies was unlawful. Trial evidence established that Halper knew that the DOH inspected the facilities on behalf of CMS and that low staffing could result in federal staffing tags/citations. *See* Government Exhibit 2262. Indeed, the Medicare Enrollment Application submitted to CMS, on which Halper was listed, expressly states that "any deliberate omission, misrepresentation, or falsification of *any information* contained . . . in any communication supplying information to Medicare, . . . may be punished by criminal, civil or administrative penalties."  *See* Government Exhibit 376 at p. 75 (emphasis added).

The corporate Defendants attempt to brush off Halper's knowledge and willfulness as to the falsifications. Specifically, they attack Harrington's trial testimony. That said, Harrington's testimony at trial was unequivocal and remarkably consistent.  Her testimony was consistent not only during trial and grand jury, but when Harrington spoke to law enforcement on other occasions. *December 1, 2023 Trial Transcript, Harrington* at 32. Consistent with her prior statements to law

enforcement and testimony, Harrington testified that Halper knew about the falsifications and even encouraged her to continue the falsifications ("I didn't hear that" AND "keep doing what you're doing"). *Id.* at 31, 173, 176-177, 186. Despite Defendants' dismissive attitude pertaining to Harrington's testimony in general, and this testimony in particular, Halper knew about the staffing falsifications and encouraged the unlawful conduct to continue.

The government presented evidence at trial that allowed the jury to reasonably find that Brighton's agents and employees acted knowingly and willfully as to Section 1035. As stated, Brighton's agents/employees falsified the staffing records to hide information from government regulators and to avoid consequences for understaffing from the DOH and CMS. Further, the individuals involved in the falsification scheme, including Hamilton and Halper (and other uncharged higher-level personnel), were educated and experienced. They directed other lower-level personnel to make the falsifications.  These lower-level individuals knew it was wrong (*i.e.,* Quinn who refused to make the falsifications at Hamilton's direction and Harrington, who made the falsifications, admitting it was wrong). Notably, these falsifications only occurred after Halper purchased Brighton and Hamilton became the DON. *Id.* at 10-11. And moreover, this falsification scheme continued under Halper's and Hamilton's watch and supervision.

By falsifying staffing sheets, directing others to do the same, and continuing this falsification scheme for years, Hamilton and Halper, along with other agents of Brighton, acted knowingly and willingly. Both Hamilton and Halper, as well as the other facility administrators, are licensed and experienced professionals who are knowledgeable about healthcare and staffing requirements. Accordingly, the trial testimony and documentary evidence clearly established that these falsifications were not just "mistakes," "loose definitions," and/or "loopholes" as the corporate Defendants claim. Defendants' Motion at p. 10. Putting people's names on staffing

23

sheets who you know are not in the building are not "mistakes." Rather, these were knowing and willful material falsifications in a matter involving a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services.

The evidence is also sufficient to support the Section 1035 verdict against Mt. Lebanon in this regard.  First, it can be noted that very similar falsifications were made about 50 miles away at another CHMS facility, Mt. Lebanon. Like Brighton, there was credible trial evidence establishing that Mt. Lebanon's employees/agents acted knowingly and willingly in falsifying the staffing sheets submitted to the DOH. Specifically, trial witnesses, including Mt. Lebanon's ADON, Yochanan Naiditch, testified that when the Human Resources Director, Martha Stillwagon, asked him to clock in when he was not working that the request was "odd" and "didn't seem right." *November 30, 2023 Trial Transcript, Naiditch* at 11. Naiditch also testified that he participated in the staffing falsifications "to have the numbers we needed and to succeed at the job." *Id.* at 52.  In addition to Naiditch's testimony, other trial witnesses testified that they were instructed to punch into the Mt. Lebanon building to make it appear like they were in the building and working when they were not, when PPD was low. *Id.* at 11; *November 29, 2023 Trial Transcript, Miller* at 7.  These "punches" were the facility's insurance policy to ensure that Mt. Lebanon would meet the staffing requirements during the DOH surveys. Specifically, the "punches" inflated the PPD when Mt. Lebanon was low.

Evidence of knowledge and willfulness at trial were further presented through Mt. Lebanon's former ADON, Jacqueline Partee's resignation letter. Partee directed this letter to Naiditch, Stillwagon, and Susan Gilbert, who was Mt. Lebanon's Administrator at that time.  The jury was able to read Partee's letter at trial. The letter further establishes the willfulness of Defendants' conduct, as it specifically states "[y]our building has *illegally* used hours to meet PPD,

which is against my morals." *Id.* (emphasis added). Susan Gilbert received this letter and forwarded this resignation letter to others. *See* Government Exhibits 2369 and 2370. Nonetheless, despite this letter and this exact language ("illegally"), the falsifications on staffing sheets at Mt. Lebanon continued. Government Exhibit 992D, 987, and 994. Even if these three high-level Mt. Lebanon administrators had been somehow ignorant as to the nature of the conduct at Mt. Lebanon, this resignation letter put them on clear notice or at least should have evoked further questions and action.

Notably, all the falsifications in Counts Ten through Twelve against Mt. Lebanon took place after Partee wrote her letter and described the falsifications to Gilbert, Naiditch, and Stillwagon as "illegal." Nonetheless, the punching and falsification scheme at Mt. Lebanon continued and fictional hours were provided to DOH to make it appear like Mt. Lebanon was meeting state and federal staffing requirements.

Like Brighton, the administrators at Mt. Lebanon, including Gilbert, Naiditch and Stillwagon were aware of the falsification/punching scheme and the relevant state and federal regulations. Indeed, Naiditch, a trained ADON/DON, and Gilbert, an experienced Administrator, knew that it was improper to add the names of employees who were not working, or even in the building, to the staffing sheets submitted to the DOH. Thus, like Brighton, the agents/employees of Mt. Lebanon acted knowingly and willfully in falsifying the staffing sheets submitted to the DOH.

### 4. The trial evidence established that the falsifications were made in connection with delivery or payment of healthcare benefits.

Finally, in attacking their Section 1035 convictions, the corporate Defendants argue that the government failed to provide credible evidence that the alleged misrepresentations were "in connection with the delivery of or payment of healthcare benefits." Defendant's Motion at pp. 12-

15.  This argument falls flat given that the evidence presented at trial, including the testimony from the DOH and CMS representatives. As stated, both Williamson (DOH) and Shulman (CMS) testified that the false information on staffing sheets were relied on by the DOH in conducting surveys to determine compliance with federal requirements governing the conditions of participation in Medicare and Medicaid.  *November 20, 2023 Trial Transcript, Williamson* at 19, 53, 113, 116-17; *December 8, 2023 Trial Transcript, Shulman*, at 207-08.

To make their argument, the corporate Defendants take an extremely narrow interpretation of the phrase "in connection with" and attempt to rely on interpretations of this phrase from an entirely different context (*i.e.,* securities fraud). Defendants' Motion at pp. 12-14. In *Sivchuk*, the court stated that the phrase "in connection with" covers "a wide range of relationships" and should be read "broadly" and "expansively."  *United States v. Sivchuk,* 2012 WL 2328143, at *9 (E.D. Pa. June 13, 2012).  In that case, the court held that the defendant's statements were "in connection with the delivery of or payment for health-care services" even though they "w[ere] clearly not made to secure payment for or delivery of any healthcare services" because "[w]hile a causal relationship may satisfy the "in connection with' requirement, it is only one of a 'wide range of relationships' covered by the phrase." *Id.* at *9.

The Court should follow this interpretation of such phrase. *See also United States v. Bell*, 282 F. App'x 184, 188 (3d Cir.2008) (sustaining a conviction for false statements made to officials during an investigation which were ultimately turned over to the Department of Health and determining that the false statements were in fact made in connection with the delivery of health care services under Section 1035). The corporate Defendants even acknowledge that the purpose of the DOH wearing its federal hat was to "determine whether a facility complied with federal

regulations to establish eligibility for Medicare and Medicaid benefits." Defendants' Motion at 17 (citing Williamson Transcript at 47).

**B.    The government presented credible evidence that Mt. Lebanon and Brighton impeded, obstructed, or influenced an investigation or matter in violation of 18 U.S.C. 1519.**

**1.    The PA DOH surveys (acting on behalf of CMS) were "matters" and "investigations" within the jurisdiction of an agency of the United States.**

In attacking their convictions, the corporate Defendants misconstrue the terms "matter" and "investigation" under Section 1519.  Again, in making their argument, the Defendants borrow extremely narrow interpretations of these terms from irrelevant contexts (*i.e.,* mail and wire fraud). Defendants' Motion at p. 16.  Contrary to their argument and as clearly articulated by CMS, the DOH surveys were both "matters" and "investigations" within the jurisdiction of an agency of the United States.

First, the corporate Defendants argue that term "matter" should be limited to an administrative proceeding, such as a formal hearing or investigation.  Defendants' Motion at p. 17. That said, they also concede that legislative history and legal interpretation of this term is "ambiguous." *Id.*  Merriam-Webster defines "matter" as "a subject under consideration."  Pursuant to this definition, as well as the trial evidence, the DOH surveys (where DOH was acting on behalf of a federal agency, CMS), were clearly "matters" within the jurisdiction of a United States agency.

 Second, and perhaps even more persuasive, pursuant to CMS regulations, the DOH surveys were also "investigations" under Section 1915. Under the general information and enforcement policies posted on the website for CMS:

> CMS maintains oversight for compliance with the Medicare health and safety standards for…continuing care providers (including hospitals, nursing homes, home health agencies (HHAs), end-stage renal disease (ESRD) facilities, hospices, and other facilities serving

Medicare and Medicaid beneficiaries), and makes available to beneficiaries, providers/suppliers, researchers and State surveyors information about these activities.

**The survey (inspection) for this determination is done on behalf of CMS by the individual State Survey Agencies.** The functions the States perform for CMS under the agreements in Section 1864 of the Social Security Act (the Act) are referred to collectively as the certification process. This includes, but is not limited to…conducting investigations and fact-finding surveys [which entails] verifying how well the health care entities comply with the "conditions of participation" or requirements.  This is referred to as the 'survey process'."

QUALITY, SAFETY & OVERSIGHT – GENERAL INFORMATION, https://www.cms.gov/medicare/health-safety-standards/quality-safety-oversight-general-information (last modified 09/06/2023)

Pursuant to this CMS provision, the DOH surveys were "investigations" on behalf of CMS. Further, as Susan Williamson from DOH explained, the DOH was acting on behalf of CMS during the various surveys and was tasked with determining compliance with federal staffing requirements. *November 20, 2023 Transcript, Williamson* at 112. Thus, the DOH surveys were "matters" and/or "investigations" within the jurisdiction of an agency of the United States (CMS) pursuant to Section 1519.

Moreover, the falsified staffing sheets provided to DOH as part of these surveys (aka "investigations") at Brighton and Mt. Lebanon impeded and obstructed the DOH's ability to determine compliance with both the ***state AND federal staffing regulations*** for these facilities. *Id.* at 113, 117.  As the government previously explained, there is no requirement that the matter or investigation have been pending or imminent at the time of the obstruction.  The requirement is only that the acts were taken in relation to, or in contemplation of, any such matter or investigation. 18 U.S.C. § 1519 (stating that obstruction may occur "in relation to of contemplation of" a matter within the jurisdiction of any department or agency of the United States). Additionally, the government is not required to prove that the corporate Defendants specifically knew the matter or

investigation was within the jurisdiction of a department or agency of the United States. *United States v. Moyer*, 674 F.3d 192, 208 (3d Cir. 2012). In other words, the corporate Defendants need not have known that they were obstructing, impeding, or influencing a matter that was federal in nature. *Id.; see also* Pattern Crim. Jury Instr. 5th Cir. 2.65 (2019). Accordingly, the government presented credible and sufficient evidence to establish that the DOH surveys were matters or investigations within the jurisdiction of an agency of the United States as required by Section 1519.

> **2.      The government presented credible evidence that the falsifications affected the federal matter/investigations.**

As the corporate Defendants acknowledge, materiality is not an element of Section 1519. Defendants' Motion at p. 18 (citing *United States v. Moyer*, 674 F.3d 192, 207-08 (3d Cir. 2012). Thus, the corporate Defendants argue that materiality is an element under Section 1519 only to preserve the issue for appeal. *Id.* That said, despite the clear evidence at trial to the contrary, the corporate Defendants argue that there was no "meaningful relation" between the falsifications on staffing sheets provided to DOH and the jurisdiction of CMS. This could not be further from the truth and what the evidence established at trial.

The government will not rehash the trial testimony mentioned above, including that Brighton was on a Provisional Two (2) license during the relevant time period, *see e.g.,* Government Exhibits 800 and 881, as well as Brighton's and Mt. Lebanon's motivation to engage in this criminal conduct, *i.e.,* avoid scrutiny, sanctions, and penalties from the DOH and CMS. That said, trial witnesses who worked at both Brighton and Mt. Lebanon specifically discussed the motives for making the falsifications on staffing sheets. *December 1, 2023 Trial Transcript, Harrington* at 25; *November 30, 2023 Trial Transcript, Naiditch* at 52. Indeed, they lied to meet the staffing requirements and avoid sanctions.

Further, based upon the trial evidence, there was more than adequate incentive or motive to lie.  Specifically, why lie and risk getting caught if the consequence was just fine or tag as the corporate Defendants' claim? Clearly the Mt/ Lebanon and Brighton agents/employees knew (or believed) much more was at stake. Furter, the trial evidence established that Mt. Lebanon's and Brighton's agents/employees thought that the staffing regulations and potential sanctions were important enough falsify.

Moreover, as stated, the testimony from the DOH and CMS representatives (Williamson and Shulman, respectively) established that there was an extremely meaningful relation between the falsifications on the staffing sheets and the jurisdiction of CMS.  Both Williamson and Shulman testified regarding the impact that the falsifications can have on their respective agencies' ability to do their jobs. They also explained the importance of having accurate staffing information in both the state and federal contexts. The trial evidence clearly established that the falsifications provided by Brighton and Mt. Lebanon to the DOH had more than just "some potential effect" on the survey process and ability to determine compliance with state and federal staffing regulations.

### 3. The government presented credible evidence regarding specific intent to sustain Section 1915 convictions.

The evidence presented at trial regarding Brighton's and Mt. Lebanon's specific intent to obstruct, impede, or influence a "matter" or "investigation" within the jurisdiction of a federal agency (CMS) was overwhelming.  Specifically, trial evidence established that staffing falsifications were made to hide the fact that Brighton and Mt. Lebanon were not complying with requisite staffing regulations and requirements.  Otherwise, Brighton and Mt. Lebanon could have just reported their staffing numbers accurately. The falsifications were intentionally made to hide the truth about the facilities' staffing levels.  Further, the falsifications were made to impede and obstruct the DOH's ability to determine compliance with state and federal staffing requirements.

*December 1, 2023 Trial Transcript, Harrington* at 25; *November 30, 2023 Trial Transcript, Naiditch* at 52.  Further, as discussed above, high-level personnel and administrators at Brighton and Mt. Lebanon (*i.e.,* Halper, Hamilton, Gilbert, Miller, and Naiditch) who had extensive experience in the skilled nursing facility industry and were very knowledgeable about state and federal staffing regulations, engaged in and facilitated the conduct and schemes.  They knew what they were doing and had a specific objective in mind.  Brighton's and Mt. Lebanon's agents/employees were aware of how the survey process worked, the applicable regulations, and the consequences of non-compliance.

### C.    The criminal conduct of Brighton's and Mt. Lebanon's agents and employees can be attributed to the companies.

As extensively discussed in the Rule 29 Response (ECF 418), various employees/agents of Brighton and Mt. Lebanon committed federal offenses and were acting within the scope of their authority and with the intent to benefit these facilities.  Accordingly, Mt. Lebanon and Brighton were held criminally liable for such their respective agents/employees' conduct.  This result is appropriate and just under applicable law.

As discussed above, the government presented evidence at trial that various individuals, including indicted and unindicted co-conspirators and other facility personnel, falsified and/or directed falsifications on staffing sheets to make it appear that Brighton and Mt. Lebanon were complying with state and federal staffing requirements and to avoid sanctions from the DOH and CMS.  *December 1, 2023 Trial Transcript, Harrington* at 25; *November 30, 2023 Trial Transcript, Naiditch* at 52.  These falsifications and related conduct were done within the scope of their employment and authority, and for the benefit of Mt. Lebanon and Brighton (*i.e.,* to avoid scrutiny and other sanctions, including fines, penalties, admission bans).  Even though the individual

defendants who were charged were acquitted, the guilty verdicts against Mt. Lebanon and Brighton should stand.

First and foremost, even though the jury acquitted some of the agents and employees of Brighton and Mt. Lebanon, *i.e.,* the individual defendants, not all of the culpable agents/employees were criminally charged. Unindicted agents/employees also broke federal law.

Further, as a general rule, its well established that inconsistent verdicts are constitutionally tolerable. *Dowling v. United States*, 493 U.S. 342, 353-54 (1990). When a defendant is acquitted on one count and convicted on another, as a "matter of law, courts treat this situation as an instance of juror lenity, undeserving as a basis for overturning a conviction." *United States v. Vastine*, 363 F.2d 853, 855 (3d Cir. 1966). For example, in U*nited States v. McCabe*, 792 F. Supp. 616 (C.D. Ill. 1992), the court noted that "a jury's motive in returning inconsistent verdicts is not relevant when determining whether a verdict should stand. That the verdict may have been the result of compromise…verdicts cannot be upset by speculation or inquiry into such matters." *Id.* at 618-19. The court further noted that "a jury may acquit on some counts and convict on others not because they are unconvinced of guilt, but because of compassion or compromise." *Id.* at 619. Further, the jury's verdicts "may reflect the jury's exercise of their power of lenity and not the government's presentation of insufficient evidence." *Id.*

Specifically, in a similar context where a corporation was convicted, but the individual co-conspirator was acquitted, the Seventh Circuit held that a "corporation may be convicted of unlawful conspiracy despite the acquittal of persons through whom it could have conspired and without whom the success of the conspiracy would have been impossible." *United States v. Gen. Motors Corp.*, 121 F.2d 376, 411 (7th Cir. 1941). Specifically, the court stated that the question on review "should not be whether the verdict against the corporations is consistent with the

acquittal of the individuals. Rather it should be whether the conviction is consistent with the evidence." *Id.* Thus, even though the jury acquitted the individual defendants, the guilty verdicts against the corporate Defendants were supported by the evidence and should stand.

## CONCLUSION

For all the foregoing reasons, the corporate Defendants' Motion should be denied. The jury's verdict was supported by the trial evidence and is not against the manifest weight of the evidence.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*s/ Nicole A. Stockey*
NICOLE A. STOCKEY
Assistant United States Attorney
PA Bar. No. 306955

*s/ Karen Gal-Or*
KAREN GAL-OR
Assistant United States Attorney
PA Bar. No. 317258

*s/ Jacqueline C. Brown*
JACQUELINE C. BROWN
Assistant United States Attorney
PA Bar No. 330010

*s/ Aaron McKendry*
AARON MCKENDRY
Special Assistant United States Attorney
PA ID No. 309846

*s/ Stephen R. Kaufman*
STEPHEN R. KAUFMAN
Executive Assistant U.S. Attorney
PA ID No. 42108

Dated: January 31, 2024