IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 21-79 |
| ) | Judge Robert J. Colville |
| COMPREHENSIVE HEALTHCARE ) | |
| MANAGEMENT SERVICES, LLC, ) | |
| d/b/a Brighton Rehabilitation and Wellness ) | |
| Center ) | |

## THE UNITED STATES' SENTENCING MEMORANDUM REGARDING COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC d/b/a BRIGHTON REHABILITATION AND WELLNESS CENTER

AND NOW comes the United States of America, by its attorneys, Troy Rivetti, Acting United States Attorney for the Western District of Pennsylvania, and Nicole A. Stockey, Assistant United States Attorney for said District, and hereby submits this Sentencing Memorandum concerning the sentencing of defendant, Comprehensive Healthcare Management Service, LLC, currently scheduled for May 20, 2025.

## BACKGROUND

On or about August 5, 2022, a federal grand jury returned a fifteen-count Superseding Indictment, charging the defendant, Comprehensive Healthcare Management Services, LLC ("CHMS") d/b/a Brighton Rehabilitation and Wellness Center ("Brighton"), with violations of 18 United States Code, Sections 1035(a)(1) and 2 and 1519 and 2. ECFs 49 and 435 (Presentence Investigation Report, PSR) ECF 435 at ¶¶2, 5. On December 18, 2023, a federal jury found Brighton guilty of Counts 2, 3, 4, 5, 6, and 7 of the Superseding Indictment. ECF 407; PSR at ¶5.

The guilty verdicts against Brighton stem from Brighton falsifying staffing records on various occasions starting in July 2018 through January 2020, and thus, violating Title 18, United States Code, Sections 1035(a)(1) and 2 (Falsification of Records Related to Health Care Matters)

1

and Title 18, United States Code, Sections 1519 and 2 (Falsification of Records in a Federal Investigation). PSR ¶2, 5. Specifically, Brighton, acting through high-level personnel and other employees (i.e., Director of Nursing, Scheduler/Administrative Assistant), falsified staffing records or directed others to falsify these records and obstructed regulators' ability to determine Brighton's compliance with federal and state regulations and conditions of participation in Medicare and Medicaid. PSR ¶¶10, 11-16.  Brighton personnel provided these falsified staffing records to the Pennsylvania Department of Health ("DOH"), acting on behalf of the Commonwealth and Centers for Medicare and Medicaid ("CMS"), during state and federal surveys, to avoid government oversight and sanctions, including citations, additional surveys, bans on new admissions and potential license suspension. PSR ¶9.

At trial, evidence established that in many instances when Brighton was projected to be below the state minimum staffing ratio/level (patient hours/care per day or "PPD"), high-ranking employees, acting within the scope of their authority and for the benefit of Brighton, directed others to "put people's names that weren't there" to give the illusion that the requisite minimum staffing ratio (PPD) was met. PSR ¶11. Following these directions, various Brighton employees added the names of individuals who were not actually working, not providing direct patient care, and, in some cases, not even in the building, to staffing sheets to meet the required minimum PPD. PSR ¶¶11-16. The members of the federal jury determined that Brighton's agents, including high-ranking personnel, made, oversaw and/or directed this unlawful conduct. PSR ¶¶11, 15.

Trial testimony also established that Brighton continued to push for new patient admissions despite low staffing and when its own nurses advised that they could not adequately care for any additional residents. PSR ¶7. As to this continued push for new admissions, Brighton's Director of Nursing during the relevant timeframe specifically wanted to avoid a ban on admissions and told Brighton's Scheduler that it was "very important to the administration [to keep] admissions up and

[get] to a 500 number." PSR ¶16. Rather than halting admissions to address these short-staffing concerns, Brighton opted to falsify records to make it appear like Brighton was complying with staffing regulations, which obstructed and impeded government regulators. PSR ¶¶8, 9.

Trial evidence further established that Brighton was routinely below the mandatory minimum staffing/PPD number and that Brighton personnel knowingly and willfully falsified staffing sheets provided to the regulators to inflate the staffing numbers to meet government regulations and avoid sanctions. PSR ¶¶11, 14, 15, 28. Evidence further showed that various witnesses made and/or were asked to make these staffing falsifications to benefit Brighton and that these falsifications were made or directed by Brighton personnel who were experienced and well-aware of the regulations and sanctions. PSR ¶¶28, 29.

On a related note, the evidence at trial established that high-ranking Brighton personnel were aware of the potential consequences for non-compliance with staffing regulations during the survey process, including a ban on admissions. PSR ¶15. Specifically, the Director of Nursing told the facility's Scheduler that Brighton "would be fined if we were short" and "could also be made to stop accepting admissions." PSR ¶15.

Pennsylvania DOH's Director of Nursing Care Facilities ("DOH Director") also testified at trial as to the consequences and sanctions available to the DOH and CMS if a facility was not in compliance with state and federal regulations. PSR ¶25. This DOH Director testified that ***bans on admission were a possible sanction*** (i.e., a tool in DOH's toolbelt) ***and would be more likely to be imposed for repeated patterns of non-compliance, particularly those involved in staffing***. PSR ¶25. This DOH Director also explained at trial that "[i]f you don't have enough staff, you may not be able to take on more residents." PSR ¶25. She also testified that the DOH was ***more likely to impose sanctions if a facility is intentionally falsifying records*** (like Brighton did repeatedly). PSR ¶25. Notably, during part of the charge period, Brighton was on a Provisional II license. PSR

3

¶27. As established at trial, there are only a certain number of provisional licenses that a facility can have before the license is suspended or revoked, which prohibits the facility from participating in Medicare and Medicaid programs. *See e.g.,* S. Williamson, Trial Transcript, November 20, 2023, at p. 114.

The DOH's Director also testified regarding the impacts of making false statements pertaining to staffing levels during the survey process, stating that it would "hugely impact" and "make it impossible" for surveyors to do their work and tell if the "residents were receiving the care that they needed." PSR ¶24. The DOH Director further testified that "staffing is really the backbone of taking care of residents…[w]ithout staffing, and without being honest about staffing, [] residents are not going to get the care they require." PSR ¶24.

On a similar note, CMS's Director of the Division of Nursing Homes ("CMS Director") testified at trial that the lies on Brighton's staffing sheets were material because they impacted surveyors' ability to determine compliance with federal regulations which are required for participation in Medicare and Medicaid. PSR ¶26. The CMS Director further testified that CMS expects the staffing information provided to the DOH on behalf of CMS to be "accurate." PSR ¶26.

Ultimately, the evidence at trial established that Brighton personnel, acting within the scope of their employment and to benefit Brighton, falsified, concealed, or covered up by trick, scheme or device, a fact in a matter involving a healthcare benefit program and that the falsifications were material and performed knowingly and willfully in connection with the delivery or payment for healthcare benefits, items, or services leading to a guilty verdict against Brighton. ECF 407; PSR ¶28.

Following Brighton's federal criminal convictions, on or about November 20, 2024, the United States Probation Office (USPO) filed its final Presentence Report (PSR), ECF 435. The

parties then submitted their respective positions with respect to sentencing factors. *See* ECFs 452, 453, 454.  In its written position with respect to sentencing factors, the government raised certain objections to the PSR, including Brighton's alleged ability to pay a fine and restitution given its common ownership interests and relationships to other well-resourced corporate entities and individuals. The government also raised objections pertaining to certain financial and transactional information pertaining to Brighton in the PSR. Brighton did not raise any objections to the PSR (ECF 452).  Further, Brighton reported that it disagreed with the PSR's offense conduct for reasons detailed in its Rule 29 and 33 motions. PSR ¶32.  That said, the Court already denied these theories and motions. ECF 427.

In the PSR, Brighton appears to take issue with restitution in this matter. Restitution is an important component of a criminal sentences, not only to compensate victims, but to help create specific and general deterrence. Pursuant to 18 U.S.C. § 3663A, restitution shall be ordered in this matter. PSR ¶90. Further, despite Brighton's alleged debts and net losses, criminal restitution can be ordered pursuant to a payment schedule if needed or appropriate.

The restitution theory and amount are premised on the charged survey dates and corresponding 30-day resident admission ban that would follow (and Medicaid payment amounts). PSR ¶33.  This restitution theory and amount are well founded and supported by the trial testimony from both the DOH and CMS Directors. PSR ¶25; *see also,* S. Williamson, Trial Transcript, November 20, 2023, at p. 16, 17, 18, 51, 59, 74, 115, 149.  As stated, the DOH Director testified at trial that bans on admission were more likely to be imposed for repeated patterns of non-compliance, particularly those involved in staffing, and that the DOH was more likely to impose sanctions if a facility is intentionally falsifying records. PSR ¶25. Here, Brighton, repeatedly did not comply with staffing regulations and intentionally falsified records.

This restitution theory and amount is further supported by Brighton's continued drive to increase admissions and its failure to halt admissions to address its low staffing issues. PSR ¶¶7, 8, 9.  Brighton opted to lie to avoid admission bans, as well as other, potential sanctions. Brighton pushed to admit new residents and maximize profits. PSR ¶9.  Accordingly, restitution should be awarded in the full amount of $12,629,257.46. PSR ¶33.

## ARGUMENT

Given the serious nature and circumstances of these offenses, Brighton's culpability, and the need to incentivize compliance with applicable laws and deter future misconduct, the Court should impose a serious sentence, that includes restitution, a fine, and term of probation.  Brighton needs to be held accountable for its criminal conduct and its federal sentence must ensure that Brighton and other similar facilities do not commit criminal conduct in the future. The government believes that a term of probation, fine, and restitution reflect the seriousness of these offenses, promote respect for the law by Brighton and similar facilities, provide just punishment and deterrence, and will protect the public from further criminal conduct. 18 U.S.C. §§3551(c) and 3553; United States Sentencing Guidelines, Chapter 8.

Brighton committed very serious offenses through high-ranking personnel. Moreover, Brighton's serious crimes impacted real people. Specifically, Brighton's criminal conduct jeopardized the health and safety of its vulnerable residents who were cheated out of having the level of care they needed and deserved. These residents did not receive the care to which they were entitled, both from a state and federal regulatory standpoint. It is also important to keep in mind that Brighton lied about meeting the absolute <u>minimum</u> staffing levels intended to protect these vulnerable residents. As the DOH Director stated herself, "staffing is really the backbone of taking care of residents…[w]ithout staffing, and without being honest about the staffing, [] residents are not going to get the care they require." PSR ¶24.

Though not able to be presented at trial, Brighton's staffing levels and corresponding falsifications resulted in increased patient falls and pressure ulcers, among other negative consequences for residents. ECF 257 at p. 9. When there is not enough staff, residents do not get toileted, showered, or repositioned timely or appropriately.

Again, though the government was not allowed to present evidence pertaining to the impact of low staffing and falsification on resident care at trial, the government believes that these impacts reflect the serious nature of Brighton's offenses and its culpability. The Court deserves to hear how this conduct impacted Brighton's residents, who were repeatedly deprived of precious and much-needed manhours of nursing staff.

As various experts have discussed, the serious nature of such offenses is reflected by the direct physical harm and serious threats to patient health in understaffed nursing homes. *See e.g.,* Hoffman, David R., "The Roles of the Federal Government in Ensuring Quality of Care in Long-Term Care Facilities." 6 ANNALS HEALTH L. 147 (1997); *United States v. GMS Management Tucker, Inc.,* No. 96-1271 (E.D. Pa., settled Feb 21. 1996). Nursing home residents represent one of the most vulnerable segments of our population due to their age, mental ability, financial status, and medical conditions. *See e.g.,* Theresamarie Mantese & Gerard Mantese, "Nursing Homes and the Care of the Elderly." 51 Mo. B. 155, 156 (May/June 1995). Further, these nursing home residents are often weak and unable to care for themselves. Many of these residents are often alone and cannot advocate for themselves or have family or friends to advocate for their needs and care. *See e.g.,* Quinn, Angela Snellenberger, "Imposing Federal Criminal Liability on Nursing Homes: A Way of Determining Inadequate Health Care and Improving the Quality of Care Delivered." 43 St. Louis U. L.J., 653, 662 (1999). Accordingly, while the victim listed in the PSR is the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid, Brighton's conduct had far-reaching impacts to its residents and beyond. PSR ¶35.

These falsifications also impacted Brighton's own staff. These staffing falsifications and lies to regulators extended and exacerbated Brighton's staffing problems by covering them up. These actions placed a heavier burden on the facility's staff who were caring for these vulnerable residents. Further, these were not just names on staffing sheets; these were hours of care that residents never received.

Brighton deliberately and repeatedly obstructed regulators from discovering its staffing issues and prevented regulators from helping Brighton address this problem. Regulators could have imposed other sanctions and worked with the facility to solve this problem. The falsifications prevented this from happening. Brighton also refused to address its own staffing issues. Rather than increasing its staffing levels, or alternatively, reducing new patient admissions to address the staffing/resident levels and ratio, Brighton put dollars ahead of its residents' well-being, kept driving for new admissions, and lied. PSR ¶¶7, 8.

The serious nature of these offenses and Brighton's culpability is further highlighted by the fact that various high-ranking Brighton personnel were aware of the falsifications and even directed and made the staffing falsifications in many instances. PSR ¶¶10-16. Further, staffing falsifications also occurred at other skilled nursing facilities under the same ownership and oversight (as Brighton) during the same timeframe, *i.e.,* Mt. Lebanon. PSR ¶ 2; ECF 437. Thus, Brighton's culpability cannot be overstated.

As reflected in the PSR, Brighton has a history of not complying with federal law and cheating its stakeholders. Again, while the Court ordered that certain evidence pertaining to Brighton's other acts were not appropriate for trial, these similar acts should be considered by the sentencing court. As discussed in the PSR's "Similar Misconduct" section, the Court entered a judgment in favor of the U.S. Department of Labor and against Brighton for violating the Fair Labor Standards Act, 29 U.S.C. §201 et seq., and specifically Sections 207, 211(c), 215(a)(2) and

215(a)(5). U.S. District Judge Stickman stated that the "overwhelmingly consistent evidence…credibly and conclusively established that Samuel Halper, CHMS Group LLC, and all 15 facility defendants created and oversaw a system whereby employees…did not receive their fair day's pay." PSR ¶38. The Court further found that defendants "intentionally maintained a system through which employees were consistently, systematically, and willfully subjected to payroll practices that did not remotely comply with the provisions of [the FLSA]." PSR ¶38. The Court also found that defendants failed to fulfill record keeping duties, pay mandated overtime, and accurately classify employees as "exempt."  PSR ¶39. The defendants created and oversaw an "adversarial" payroll system where employees were regularly shortchanged and forced to fight for their compensation. PSR ¶39. The system often left defendants' employees going without correct pay or even quitting altogether. PSR ¶39.  The Court found that defendants "willfully, if not maliciously" violated the FLSA. PSR ¶39. Thus, Brighton appears to have a pattern of playing fast and loose with records, regulators, and cheating its stakeholders.

Brighton also has a history of CMS fines and administrative sanctions as set forth in the PSR. These fines and payment denials continued well after the criminal conduct and even Brighton's criminal conviction. PSR ¶41. Even recently, Brighton incurred a significant number of deficiencies. PSR ¶¶42, 43. Brighton had a total of 49 deficiencies recorded for an inspection occurring on or about March 13, 2024. Notably, this was about <u>five times</u> more than the national average (only 9.6) and Pennsylvania average (10.3). PSR ¶42. This number also increased significantly since Brighton's inspection on or about March 31, 2023. Moreover, Brighton's deficiencies were not insignificant, with the vast majority (44 to 49) of these deficiencies being scored as a "2" on a scale from 1 to 4 (least to most level of harm scale).  PSR ¶43. That said, five (5) deficiencies were scored at a level "4," meaning that there was "immediate jeopardy to resident health or safety," with the majority of those five deficiencies effecting many residents. PSR ¶44.

These level "4" deficiencies listed in Brighton's PSR include failures to: "ensure that a nursing home area is free from accident hazards and provides adequate supervision," "provide basic life support, including CPR, prior to the arrival of emergency medical personnel," "provide appropriate treatment and care according to orders, residents' preferences and goals," among others. PSR ¶44. These deficiencies further show that Brighton continues to operate in a manner that put its residents' health, care, and safety at issue.

As to sentencing, Congress requires that sentencing courts consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, adequate deterrence, and protect the public. Without imposing significant punishment for serious federal offenses, society risks creating incentives for healthcare corporations to engage in such criminal conduct and further jeopardize the health and safety of our community members. Without serious consequences and punishment, businesses may consider engaging in this conduct.

Healthcare corporations and businesses allow for life to continue and provide for the basic needs of American citizens. If healthcare entities, like Brighton, and other skilled nursing facilities, are able to falsify records and obstruct/defraud regulators, without consequences, patients will continue to be harmed and taxpayer money misused. Without serious consequences to hold healthcare facilities accountable for their actions, this type of fraud will continue to happen in the Western District of Pennsylvania and elsewhere. Without such consequences, these facilities will believe that they can escape responsibility for their actions.

The sentence imposed must further inform others that engaging in such conduct in the Western District of Pennsylvania will not be tolerated, and such criminal conduct will always be pursued. As stated above, Brighton's falsifications were far from isolated instances. Further, this criminal conduct was far from victimless and caused federal funding and taxpayer dollars to be

directed to Brighton for new admissions when these admissions should have been halted. Brighton's conduct also caused surveyors to be obstructed, and agencies deceived. Had Brighton been honest about its staffing levels, appropriate corrective measures could have been implemented.

Those who lie to the government and break the law must be held accountable. Moreover, despite its criminal conviction, Brighton has shown that it continues to still come short of applicable regulations with the aforementioned fines and deficiencies. The government believes that a sentence consistent with the upper levels of the provisions set forth in PSR Part E accurately accounts for the sentencing considerations. Further, to the government's knowledge, these sentencing options would be consistent with sentences imposed against similarly situated defendants and would provide adequate punishment and deterrence for further similar conduct.

Despite Brighton's alleged financial condition, fines and restitution should still be ordered, pursuant to a payment schedule, if necessary or appropriate. Despite its relationship to other well-resourced entities and individuals, Brighton's alleged inability to pay should not constitute an absolute shield to its sentence. Without financial consequences to hold healthcare facilities and companies accountable, this type of fraud will continue to occur.

### GOVERNMENT WITNESSES FOR SENTENCING

As stated, Brighton's criminal conduct impacted various stakeholders, and most notably, its own residents and their families. The government intends to have the following witnesses testify at the sentencing hearing to explain their personal knowledge and experiences related to the low staffing, failure to address these issues, and staffing falsifications at Brighton:

- **Jamie Worthy-Smith**: Ms. Worthy-Smith was the sister of former Brighton resident, Kim Warford (deceased). Ms. Worthy-Smith will be able to speak to the level of care and treatment Ms. Warford received while at Brighton during the time period of June 2013 (prior to CHMS ownership of Brighton) through April 2020, including the decline in staffing at Brighton under CHMS

ownership and complications from low staffing.

- **Lisa Zynosky**:  Ms. Zynosky was a friend of former Brighton resident, Mary Kay Leahy (deceased).  Ms. Zynosky also had a family member who was a resident at Brighton for 11 years.  Ms. Zynosky will be able to speak to the treatment of Ms. Leahy for the period prior to CHMS ownership of Brighton through January 2021, including the decline in staffing at Brighton under CHMS ownership, complications from low staffing, and the specific lack of general care, including personal hygiene, that Ms. Leahy received while she was a resident at Brighton.

### RESTITUTION & FORFEITURE

While forfeiture is not applicable in this case, as explained above, Brighton owes restitution to the United States Department of Health and Human Services for Medicare and Medicaid Services ("HHS/CMS") as outlined in the PSR ¶¶33, 90; 18 U.S.C. § 3663A.

Respectfully submitted,

TROY RIVETTI
Acting United States Attorney

/s/ *Nicole A. Stockey*
NICOLE A. STOCKEY
Assistant U.S. Attorney
PA ID No. 306955